**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| WILLIE D. BEMBRY, | : | Case No. 3:15-cv-344 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

## I.     Introduction

Plaintiff Willie D. Bembry brings this case challenging the Social Security Administration's denial of his applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. He applied for benefits on July 26, 2012, asserting that he could no longer work a substantial paid job due to the residual effects of right ankle pilon fracture and morbid obesity. Administrative Law Judge (ALJ) Amelia G. Lombardo concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Lombardo's non-disability decision.

## II.   <u>Background</u>

Plaintiff asserts that he has been under a "disability" since July 20, 2012.  He was thirty-five years old at the time and was therefore considered a "younger person" under Social Security Regulations.  He has a ninth-grade or limited education.

### A.   **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Lombardo that his main problem is his right ankle.  (Doc. #6, *PageID* #80).  He fractured it and then had surgery to repair it in July 2012.  *Id*.  He had a second surgery in August 2012 and a third in April 2013 because of an infection.  *Id*.  Plaintiff's doctor, Dr. Peters, told him that he would have constant swelling in his ankle and would get arthritis.  *Id.* at 82.  Plaintiff's ankle is in constant pain.  *Id.* at 91.  He explained, "It swells up to the point where I can't even hardly [] move my ankle back and forth . . . [It feels like] somebody has a sledge hammer sitting on my foot and . . .[is] putting pressure on it."  *Id.* at 84.  He takes pain medication but it does not help.  *Id.* at 84, 91.  Plaintiff's doctor prescribed a cane but he could not afford to purchase it, so he uses a walker.  *Id.* at 88-89.

Plaintiff's weight also contributes to the problems with his ankle.  *Id.* at 82.  He testified that he is six foot, five inches tall and weighs five-hundred pounds.  *Id.* at 78.  He testified that he has been trying to lose weight and has lost fifty pounds over the past year.  *Id.* at 82, 86.  He tries to do fifty pushups, fifty sit-ups, and fifty squats twice per day.  *Id.* at 87.  He noted that the squats increase his ankle pain.  *Id.* at 90-91.  He also tries to walk to the corner and back.  *Id.* at 88.

Plaintiff lives in an apartment with his fiancée and teenage daughter.  *Id.* at 78.  During the day, he tries to keep his ankle elevated above his heart.  *Id.* at 89.  His daughter does the majority of the housework.  *Id.* at 86.  He sometimes makes his bed and does some cooking.  *Id.* at 86-87, 91.  He goes grocery shopping once per month but needs to lean on the cart or use a walker.  *Id.* at 91.  He is able to dress and groom himself.  *Id.* at 88.  Plaintiff estimated that he could walk for ten minutes at a time, stand for five minutes at a time, and lift forty to fifty pounds on a regular basis.  *Id.* at 83-84.  When he is sitting, his ankle hurts and will swell up.  *Id.* at 84.

### B.    Medical Opinions

#### i.  Paul G. Peters, M.D.

Dr. Peters, Plaintiff's treating physician/surgeon, completed a basic medical questionnaire on March 4, 2013 and a physical residual functional capacity questionnaire on July 31, 2013.  *Id.* at 460-63, 599-600.  Dr. Peters noted that Plaintiff had a right ankle pilon fracture and open wound.  *Id.* at 599.  He opined that Plaintiff was "temporarily totally disabled" for between nine and eleven months, beginning on his original injury date.  *Id.* at 600.

3

In the July questionnaire, Dr. Peters indicated that he diagnosed right distal tibial plafond fracture with fibular fracture, morbid obesity, and post-traumatic arthritis. *Id.* at 460. Plaintiff's symptoms include pain, stiffness, and wound-healing issues. *Id.* at 460. His range of motion was limited to between zero and twenty degrees. *Id.* Dr. Peters opined that Plaintiff's impairments lasted or can be expected to last at least twelve months. *Id.*

Dr. Peters also opined that Plaintiff's pain and other symptoms would frequently interfere with the attention and concentration needed to perform simple work tasks. *Id.* at 461. He can walk less than one city block without severe pain or rest, sit for more than two hours at one time for a total of at least six hours in an eight-hour day, stand for thirty minutes at one time (possibly increasing to one to two hours with time), and stand/walk for a total of less than two hours total in an eight-hour workday. *Id.* at 461-62. Dr. Peters noted that Plaintiff needs a job that permits shifting positions at will from sitting, standing, or walking and that he must use a cane or other assistive device while engaged in occasional standing/walking. *Id.* at 462. He can frequently lift and/or carry less than ten pounds, occasionally lift and/or carry up to twenty pounds, and never lift and/or carry fifty pounds. *Id.* He can occasionally crouch/squat, rarely climb stairs, and never climb ladders. *Id.* at 463. Dr. Peters indicated that on average, Plaintiff is likely to be absent two days per month as a result of his impairments or treatment. *Id.*

## ii. Williams Bolz, M.D. & Leon D. Hughes, M.D.

Dr. Bolz reviewed Plaintiff's records on October 13, 2012. *Id.* at 100-07. Dr. Bolz opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift

and/or carry twenty-five pounds, stand and/or walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day. *Id.* at 104.  Additionally, he can never climb ladders, ropes, and scaffolds, and frequently climb ramps/stairs, stoop, kneel, and crawl. *Id.* at 104-05.  Dr. Bolz concluded Plaintiff is not disabled. *Id.* at 107.

On January 28, 2013, Dr. Hughes reviewed Plaintiff's records and agreed with the findings of Dr. Bolz. *Id.* at 118-26.

## III.   <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Lombardo to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five

6

sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]  She reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since July 20, 2012.

Step 2:     He has the severe impairments of residual effects of right ankle pilon fracture and morbid obesity.

Step 3:     He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "sedentary work . . . subject to the following limitations: the ability to shift positions between sitting and standing every 30 minutes for one to two minutes at a time; no climbing ladders, ropes, or scaffolds; no exposure to heights or hazards; occasional climbing ramps and stairs; the ability to use a cane to ambulate, but the cane is not needed at the work station."

Step 4:     He is unable to perform any of his past relevant work.

Step 5:     He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 57-69).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 68.

## V.     <u>Discussion</u>

Plaintiff contends that the ALJ failed to properly weigh his treating physician's opinions.  He also argues that the ALJ did not sufficiently consider his obesity at step four of the sequential analysis and erred in finding that he was not credible.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

The Commissioner maintains that the ALJ properly weighed the medical opinions of record and reasonably accommodated Plaintiff's obesity.  The Commissioner also asserts that substantial evidence supports the ALJ's finding that Plaintiff was not fully credible.

### A.    Obesity

The Social Security Administration defines obesity as "a complex, chronic disease characterized by excessive accumulation of body fat.  Obesity is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral)."  SSR 02-1p, 2002 WL 34686281, at *2 (Soc. Sec. Admin. Sept. 12, 2002).

The Social Security Administration requires ALJs to consider obesity at steps two through five of the five-step sequential evaluation process.  *Id.* at *3; *see also* 20 C.F.R. § 404.1520(a)(4).  Specifically, ALJs must "consider obesity in determining whether:  [t]he individual has a medically determinable impairment. . . [;] [t]he individual's impairment(s) is severe. . . [;] [t]he individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . [; and] [t]he individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy. . . ."  SSR 02-1p, 2002 WL 34686281, at *3.  At each of these steps, because "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately," ALJs "must consider any additional and cumulative effects of obesity."  20 C.F.R. § 404, Subpt. P, App. 1, § 1.00(Q).

In the present case, the ALJ found that morbid obesity is one of Plaintiff's severe

impairments:  "[Plaintiff] is also overweight.  He initially reported a weight of 366 pounds and a height [of] 76 inches, and at the hearing, he reported a weight of 500 pounds.  With a body mass index ranging from 44.5 to 60.9, [Plaintiff] is considered to be morbidly obese, and that condition could aggravate [his] ankle condition."  (Doc. #6, *PageID* #s 59-60).

She also properly acknowledged that although there is no listing for obesity, it "may be disabling in and of itself and may dramatically worsen other medical conditions."  *Id.* at 61 (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 1.00(Q) and SSR 02-1p).  Specifically, "if the obesity is of such a level that it results in an inability to ambulate effectively, . . . it may substitute for a major dysfunction of a joint(s) . . . and would support a finding of medical equivalence."  *Id.* (internal quotation marks omitted) (citing SSR 02-1p).  She concluded that Plaintiff does not have an impairment(s) that meets or medically equals the severity of the listed impairments.  *Id.*

At step four, ALJ Lombardo states that she considered the exacerbating effects of Plaintiff's obesity.  *Id.* at 64.  She explained that despite his physicians recommending exercise and weight loss, there is no evidence in the record that he lost weight or tried to do so.  *Id.* (citations omitted).  Although he testified that he had lost weight, "the records show an <u>increase</u> of almost 140 pounds between April 2013 and May 2014."  *Id.* (emphasis in original) (citations omitted).  The ALJ concluded, "Such poor compliance suggests that the exacerbating effects of obesity are not as severe as alleged by [Plaintiff]."  *Id.*

The ALJ's consideration of Plaintiff's failure to lose weight is improper under the

Social Security Administration's Regulations and Rulings. *See* SSR 02-1p, 2002 WL 34686281. The Administration recognizes, "Obesity is a disease that requires treatment, although in most people the effect of treatment is limited. However, if untreated, it tends to progress." SSR 02-1p, 2002 WL 34686281, at *8. In addition, "People with extreme obesity [like Plaintiff], even with treatment, will generally continue to have obesity. Despite short-term progress, most treatments for obesity do not have a high success rate." *Id.*

The Administration will "rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits." *Id.* at *9. And, "Before failure to follow prescribed treatment for obesity can become an issue in a case, [an ALJ] must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s)." *Id.* In other words, ALJ Lombardo must find that Plaintiff is disabled because of obesity before she can consider whether Plaintiff failed to follow a prescribed treatment. If the ALJ does find that an individual is disabled because of obesity, then the ALJ can only find failure to follow prescribed treatment if all of the conditions of Social Security Ruling 82-59, Title II and XVI: Failure to Follow Prescribed Treatment, are met. *Id.*; *see also* SSR 82-59, 1982 WL 31384 (Soc. Sec. Admin. 1982).

In the present case, the analysis need not continue past the title of Social Security Ruling 82-59 because Plaintiff's treating physician did not *prescribe* exercise or weight loss. "A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment." SSR 02-1p, 2002 WL 34686281, at *9. ALJ Lombardo states, "[Plaintiff's] physicians have *recommended*

10

exercise and weight loss . . . ."  (Doc. #6, *PageID* #64) (emphasis added) (citations omitted).  Recommendations do not fall under the category of "prescribed treatment."

The ALJ's failure to properly consider the severity of Plaintiff's obesity taints her entire analysis of Plaintiff's residual functional capacity.  She could not have properly considered the combined effects of Plaintiff's obesity and ankle injuries if she failed to apply the correct legal criteria when she considered the severity of his obesity.  *See* SSR 02-1p, 2002 WL 34686281, at *6. ("The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."); *Dillard v. Comm'r of Soc. Sec.,* No. 16-cv-12050, 2017 WL 431555, at *3 (S.D. Mich. Feb. 1, 2017) ("On remand, the ALJ must make specific findings as to the effect, if any, of plaintiff's obesity on her other impairments . . . .").

Therefore, substantial evidence does not support the ALJ's residual functional capacity assessment.

### B.    Plaintiff's Credibility

Plaintiff contends the ALJ failed to give adequate consideration to his pain, credibility, and subjective complaints.  (Doc. #8, *PageID* #s 641-45).  The Sixth Circuit established a two-part analysis for assessing the credibility of a plaintiff's statements about his/her symptoms:

> First, the ALJ will ask whether there is an underlying medically determinable physical [or mental] impairment that could reasonably be expected to produce the claimant's

11

> symptoms.  20 C.F.R. § 416.929(a).  Second, if the ALJ finds
> that such an impairment exists, then he must evaluate the
> intensity, persistence, and limiting effects of the symptoms on
> the individual's ability to do basic work activities.  *Id.*

*Rogers,* 486 F.3d at 247; *see also* 20 C.F.R. § 416.929.  When evaluating the intensity,

persistence, and limiting effects of a plaintiff's symptoms, the ALJ must consider the

following factors: daily activities; location, duration, frequency, and intensity of the pain

or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness,

and side effects of any medication the plaintiff takes or has taken to alleviate symptoms;

treatment, other than medication, the plaintiff receives or has received for relief of

symptoms; any measures the plaintiff uses or has used to relieve symptoms; and other

factors concerning the plaintiff's functional limitations and restrictions due to pain or

other symptoms.  20 C.F.R. §416.929(c)(3).

The ALJ "must then make a finding on the credibility of the individual's

statements about symptoms and their functional effects."  SSR 96-7p, 1996 WL 374186,

at *4 (Soc. Sec. Admin. July 2, 1996).[3]  "Social Security Ruling 96-7p also requires the

ALJ explain his credibility determinations in his decision such that it must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight."  *Rogers*,

486 F.3d at 248 (internal quotation and footnote omitted); *see also Felisky v. Bowen*, 35

---

[3] The Social Security Administration issued SSR 16-3p, effective March 16, 2016, which supersedes SSR 96-7p.  At the time of the ALJ's decision in this case, SSR 96-7p was still in effect.

F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.") (citation omitted).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007). However, an ALJ's assessment of credibility must be supported by substantial evidence. *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

In the present case, ALJ Lombardo found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible . . . ." (Doc. #6, *PageID* #62). She provided several reasons for her assessment of Plaintiff's credibility.

The ALJ first finds, "[Plaintiff's] assertion that he has not been able to work at any time since the alleged disability onset date is not supported by objective medical evidence." *Id*. Specifically, Plaintiff "recovered relatively well, and [has] improved well within 12 months of the initial surgery, to the point he has been able to perform at least [a] reduced range of sedentary work . . . ." *Id.* at 63. Substantial evidence does not support the ALJ's finding.

Plaintiff first underwent surgery on July 21, 2012 for closed reduction of the right pilon fracture with spanning external fixation placement. *Id.* at 412. On August 10,

2012, he underwent a second surgery for irrigation and debridement of his right lower leg, removal of the external fixator, and open reduction internal fixation of his right distal tibia and fibula. *Id.* at 314. For the next several months, Plaintiff appeared to be slowly recovering. For example, in October 2012, Dr. Peters noted that x-rays revealed "[s]ome early signs of healing . . . ." *Id.* at 374. He noted in March 2013 that Plaintiff's ankle was "healed radiographically," but also noted that Plaintiff reported discomfort. *Id.* at 596.

On April 8, 2013, approximately eight months after Plaintiff's second surgery, he presented to Miami Valley Hospital with swelling of his right lower extremity up to his knee. *Id.* at 478. Despite elevating his leg, the swelling persisted for two days and then began bleeding from the lateral incision. *Id.* Although x-rays revealed that the hardware in his ankle was still in place and there were no signs of hardware failure, Dr. Peters diagnosed right ankle late wound dehiscence breakdown with infected deep hardware. *Id.* at 471, 593. On April 15, 2013, Plaintiff underwent surgery for removal of hardware, lateral malleolus and distal fibula, and application of wound vacuum-assisted closure. *Id.* at 471. Dr. Peters informed Plaintiff that long term, he may need an ankle fusion. *Id.* at 593.

By June 10, 2013, Plaintiff was still experiencing episodic swelling and degenerative changes. *Id.* at 588. X-rays revealed continued ossification of his distal tibia fracture, exuberant callus formation within the syndesmosis, and remarkable arthritic change in the lateral. *Id.* at 597. Dr. Peters recommended that he increase activity slowly as tolerated. *Id.* He further opined, "He has not been working or really

14

doing anything on this ankle and so building up to activities to resume his strength and endurance will take a *prolonged period* of time." *Id.* (emphasis added).

Plaintiff last saw Dr. Peters in July 2013. *Id.* at 464. Dr. Peters noted that Plaintiff still used a walker for stability but used it more like a cane. *Id.* He also noted that Plaintiff could continue to wear his lace-up ankle brace as needed, should increase his activity as tolerated, and may use a cane to help with balance for longer distances. *Id.*

As this brief narrative illustrates, within the twelve months after Plaintiff's initial surgery, he experienced several complications and underwent two additional surgeries. The ALJ's conclusion that Plaintiff "improved well within 12 months of the initial surgery" is not supported by substantial evidence.

The record further reveals that Plaintiff's difficulty with his ankle continued after his treatment with Dr. Peters. For example, in November 2013, Plaintiff presented to his primary-care physician, Dr. Martin Schear, reporting right ankle pain. *Id.* at 609-14. Plaintiff was also experiencing fatigue and sleep disturbances. *Id.* Dr. Schear noted that his right ankle was tender through range of motion and he had a limping gait. *Id.* at 611. He also noted, "rx cane . . . ." *Id.* Plaintiff saw Dr. Schear again in February 2014. *Id.* at 604-08. He reported right ankle pain, fatigue, and shortness of breath. *Id.* at 605. Upon examination, Dr. Schear observed three scars, tenderness, and anterior lateral edema. *Id.*

In March 2014, Plaintiff changed his primary-care physician to Dr. Rhea Rowser. *Id.* at 575. Although Dr. Rowser noted a "stable gait," she also indicated that Plaintiff's right foot pain prohibited his ability to exercise. *Id.* Additionally, Plaintiff reported no arthritic pain but indicated he has swelling and morning stiffness. *Id.* Upon examination,

Dr. Rowser noted pain with range of motion in his right ankle. *Id.* at 576.

Together, Dr. Rowser's treatment notes, Dr. Schear's treatment notes, Dr. Peters's surgery and treatment notes, and hospital records constitute substantial objective medical evidence supporting Plaintiff's allegation of disability, and therefore, the ALJ's conclusion that the record lacks objective medical evidence is not supported by substantial evidence.

The ALJ also found that Plaintiff's description of his daily activities was "inconsistent with his complaints of disabling symptoms and limitations." *Id.* at 64. The ALJ noted that Plaintiff testified that his daughter did all the housework but he sometimes makes his bed. Further, he testified that he goes grocery shopping once a month and does fifty push-ups, fifty sit-ups, and fifty squats twice a day." *Id.* (citations omitted). The ALJ noted that although Plaintiff said the squats increased his ankle pain, "this activity nonetheless demonstrates an ability to perform the reduced range of sedentary work . . . ." *Id.*

The ALJ's finding that these activities are inconsistent with the level of limitation Plaintiff alleges is not supported by substantial evidence. Plaintiff's ability to "sometimes" make his bed is not inconsistent with his alleged disabling symptoms. Plaintiff testified that he can he walk for up to ten minutes at a time, *id.* at 83, and it is unlikely that making his bed would take more time than that. Although the ALJ is correct that Plaintiff goes to the store once a month, he testified that he has to use his walker or lean against the cart when walking and has to sit down after twenty minutes. *Id.* at 91-92. Further, the ALJ omits or ignores that he does push-ups against the kitchen

16

counter because he cannot get down on the ground and he does sit-ups in bed. *Id.* at 87. Plaintiff also said that he *tries* to do his exercises twice per day. *Id.* Plaintiff's limited activities are not inconsistent with his allegations of disabling symptoms.

The ALJ found that she "cannot reasonably infer that [Plaintiff] has not worked since the alleged onset date due solely to his impairments." *Id.* at 64. She notes that Plaintiff stopped working in February 2011, more than one year before his alleged disability onset date. *Id.* He stopped working "because he was 'terminated,' not because of any alleged disability." *Id.* (quoting Exhibit 2E, page 2). The ALJ concludes, "Thus, it is reasonable to infer that [Plaintiff's] lack of employment is not necessarily due to any disabling impairments." *Id.* In reaching this conclusion, however, the ALJ does not consider any other potential reasons for Plaintiff's lack of employment. Given the multitude of possible reasons for unemployment,[4] and the lack of evidence in the record concerning why he was not employed at his alleged disability onset date, it is not reasonable to infer Plaintiff's lack of employment is probative of his disability status or credibility.

The ALJ also considers Plaintiff's unemployment benefits, noting that Plaintiff received unemployment benefits in the second and third quarters of 2012, and in order to receive those benefits, he had to certify that he was ready, willing, and able to work. *Id.* The ALJ found that such a statement is inconsistent with Plaintiff's allegations that he

---

[4] In Feburary 2011, Ohio's unemployment rate was 9.1. Bureau of Labor Statistics, *Databases, Tables & Calculators by Subject,* U.S. DEP'T OF LABOR, https://data.bls.gov/timeseries/LASST390000000000003 (data extracted on Feb. 14, 2017).

has been unable to work since July 20, 2012.  *Id.*  Substantial evidence does not support this finding.

The Ohio Department of Job and Family Services divides each year into four quarters.  The second quarter of 2012 includes April 1 through June 30.  *See Unemployment Compensation FAQs,* Ohio Dep't of Job & Family Servs., https://jfs.ohio.gov/unemp_comp_faq/faq_elig_definitions1.stm (last visited Feb. 14, 2017).  Plaintiff does not claim that he was disabled between April 1, 2012 and June 30, 2012.  His alleged disability onset date is July 20, 2012.

The third quarter ranges from July 1 through September 30.  *Id.*  Thus, there is a possibility that Plaintiff received unemployment after his alleged disability onset date.  However, the limited evidence in the record does not indicate if he received unemployment for the *entire* third quarter.  It only shows that Plaintiff received $980.00 in the third quarter of 2012 and $1,568.00 in the second quarter of 2012.  (Doc. #6, *PageID* #234).  The higher amount paid in the second quarter suggests that Plaintiff did not receive unemployment for the entire third quarter.  Under these particular facts.  Plaintiff's receipt of unemployment benefits does not work against his credibility because the termination of these benefits in the third quarter, shortly after his disability onset date, is consistent with his asserted inability to work starting on July 20, 2012.  *See Webster v. Colvin*, No. 3:13-CV-497, 2014 WL 4095341, at *9 (E.D. Tenn. Aug. 19, 2014) ("Generally, 'the underlying circumstances will be of greater relevance than the mere application for and receipt of the benefits.'") (citation omitted).

As explained in more detail above, the ALJ also improperly considered Plaintiff's failure to follow prescribed treatment when weighing his credibility. The Commissioner acknowledges that the ALJ "inappropriately considered Plaintiff's failure to lose weight . . . , but contends that her error was harmless because "one factor does not warrant reversal in light of the overall reasonableness of the ALJ's analysis." (Doc. #13, *PageID* #675). The Commissioner's contention lacks merit. For the reasons stated above, the ALJ's overall analysis of Plaintiff's credibility is not reasonable and is not supported by substantial evidence.

Accordingly, Plaintiff's Statement of Errors is well taken.[5]

### C.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

---

[5] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment his treating physician's opinion is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041. The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Willie D. Bembry was under a "disability" within the meaning of the Social Security Act;

3.      This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.      The case be terminated on the Court's docket.


Date: February 17, 2017               *s/Sharon L. Ovington*
                                      Sharon L. Ovington
                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).